**CLOSED**



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAMES STANTON,

        Petitioner,

                                    CASE NO. 04-CV-71351-DT

v.                                    HONORABLE GEORGE CARAM STEEH

HUGH WOLFENBARGER,

        Respondent.

_____/



## OPINION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS

        James Stanton ("Petitioner"), a state prisoner presently confined at the Standish

Maximum Correctional Facility in Standish, Michigan, has filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted of second-degree murder and

possession of a firearm during the commission of a felony following a jury trial in the Wayne

County Circuit Court in 2001. He was sentenced to consecutive terms of 18 to 30 years

imprisonment and two years imprisonment on those convictions. In his pleadings, Petitioner

asserts claims of prosecutorial misconduct, ineffective assistance of counsel, defective reasonable

doubt instruction, and cumulative error. For the reasons stated below, the petition for writ of

habeas corpus is denied.

## I.      Facts and Procedural History

        Petitioner's convictions arise from the shooting death of Anthony Adams in Detroit,

Michigan on August 21, 2000. Witnesses at trial testified that Petitioner and Adams had an

argument on the sidewalk, that Petitioner walked to the side of a house and retrieved a gun, and

that Petitioner fired three or four fatal shots at Adams.  The Court adopts the statement of facts

set forth in Petitioner's brief on appeal to the Michigan Court of Appeals, attached as an

appendix to this opinion.

Following his convictions and sentencing, Petitioner filed an appeal as of right with the

Michigan Court of Appeals, asserting the same claims presented in the instant petition.  The

Michigan Court of Appeals affirmed Petitioner's convictions and sentence.  *People v. Stanton*,

No. 233779, 2002 WL 31160297 (Mich. App. Sept. 27, 2002) (unpublished).  Petitioner then

filed a delayed application for leave to appeal with the Michigan Supreme Court, which was

denied.  *People v. Stanton*, 468 Mich. 894, 661 N.W.2d 241 (2003).

Petitioner thereafter filed the present petition for writ of habeas corpus asserting the

following claims:

I.      The prosecutor improperly vouched for and bolstered his case by
        questions, innuendo, and argument suggesting that witnesses who still
        lived in the neighborhood had been intimidated, threatened, or bribed, but
        witnesses supporting the prosecution were "quality witnesses," and were
        testifying truthfully because they had moved out of the neighborhood and
        were not subject to threats or intimidation.  This was prosecutorial
        misconduct denying the due process right to a fair trial.

II.     Ineffective assistance of counsel denied a fair trial.

        A.      The prosecutor improperly presented extremely prejudicial other
                acts evidence that Petitioner's father had obstructed the police by
                giving them false information concerning Petitioner's name and
                whereabouts, and that the father had accompanied Petitioner when
                he turned himself in to police several weeks later.  Defense counsel
                failed to object to this highly prejudicial evidence implying guilt.

        B.      Petitioner's trial counsel ineffectively failed to object to the
                prosecutorial misconduct set forth in Argument I.

2

III.    Defective reasonable doubt instruction requires a new trial.

IV.    The cumulative effect of error requires that Petitioner be granted a new trial.

Respondent has filed an answer to the petition asserting that the claims should be denied based upon procedural default and/or for lack of merit.

## II.    Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see*

3

*also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of §

2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the

correct governing legal principle from [the Supreme] Court but unreasonably applies that

principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.  However, "[i]n order for a federal

court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state

court's decision must have been more than incorrect or erroneous.  The state court's application

must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted);

*see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether

the state court's decision comports with clearly established federal law as determined by the

Supreme Court at the time the state court renders its decision.  *See Williams*, 529 U.S. at 412;

*see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  Section 2254(d) "does not require

citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme

Court] cases, so long as neither the reasoning nor the result of the state-court decision

contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

While the requirements of "clearly established law" are to be determined solely by the holdings

of the Supreme Court, the decisions of lower federal courts are useful in assessing the

reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d

667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are entitled to a presumption of correctness

on federal habeas review.  *See* 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption

with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**III.     Analysis**

**A.     Prosecutorial Misconduct Claim**

Petitioner first asserts that he is entitled to habeas relief because the prosecutor engaged

in misconduct by arguing that witnesses who remained in Petitioner's neighborhood felt

intimidated and threatened and that witnesses who had left the neighborhood were more

credible.  Respondent contends that this claim is barred by procedural default because Petitioner

failed to object to the prosecutor's remarks at trial.

Habeas relief may be precluded on claims that a petitioner has not presented to the state

courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72

(1977); *Couch v. Jabe*, 951 F.2d 94 (6th Cir. 1991).  In *Wainwright*, the United States Supreme

Court explained that a petitioner's procedural default in the state courts will preclude federal

habeas review if the last state court rendering a judgment in the case rested its judgment on the

procedural default.  433 U.S. at 85.  In such a case, a federal court must determine not only

whether a petitioner has failed to comply with state procedures, but also whether the state court

relied on the procedural default or, alternatively, chose to waive the procedural bar.  "A

procedural default does not bar consideration of a federal claim on either direct or habeas review

unless the last state court rendering a judgment in the case 'clearly and expressly' states that its

judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989).  The

last *explained* state court judgment should be used to make this determination. *Ylst v.*

*Nunnemaker*, 501 U.S. 797, 803-05 (1991).  If the last state judgment is a silent or unexplained

denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

Here, the Michigan Court of Appeals rendered the last reasoned opinion. In dismissing Petitioner's claims, the court relied upon a state procedural bar -- Petitioner's failure to object to these matters at trial. *See Stanton*, 2002 WL 31160297 at *1. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *See People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999); *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *See Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute a waiver of state procedural default rules. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *See McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). In this case, the Michigan Court of Appeals denied this claim based upon Petitioner's failure to object at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

In this case, Petitioner alleges the ineffective assistance of counsel as cause to excuse his default. Even assuming that Petitioner could establish that counsel erred, however, he cannot establish prejudice as this claim lacks merit.

The United States Supreme Court has stated that prosecutors must "refrain from

6

improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295

U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must

demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the

resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974). The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for

determining whether prosecutorial misconduct violates a defendant's due process rights. *See*

*Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must

determine whether the challenged statements were indeed improper. *Id*. at 452. Upon a finding

of impropriety, the court must decide whether the statements were flagrant. *Id*. Flagrancy is

determined by an examination of four factors: 1) whether the statements tended to mislead the

jury or prejudice the accused; 2) whether the statements were isolated or among a series of

improper statements; 3) whether the statements were deliberately or accidentally before the jury;

and 4) the total strength of the evidence against the accused. *Id*.; *see also Boyle v. Million*, 201

F.3d 711, 717 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir.

1999)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so

pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as

probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)

(citations omitted).

    In reviewing this claim for plain error, the Michigan Court of Appeals found no

prosecutorial misconduct, stating in relevant part as follows:

> Our review of the record reveals no error. The record reflects that,
> notwithstanding testimony from several witnesses that Jeffrey Boyd was an
> eyewitness to the shooting, Boyd testified that he was not present when the

7

shooting occurred and did not know anyone involved in the incident. Another eyewitness, Anthony Hayes, failed to appear to testify at defendant's trial and, when he finally arrived in the courtroom, he contradicted much of his prior testimony regarding defendant's culpability.  Testimony established that Boyd, along with Hayes, remained residents of the neighborhood where the shooting occurred and that Hayes ran away from home shortly before the trial began.

The prosecutor properly questioned Hayes' relatives about his whereabouts. Further, the prosecutor was free to ask Hayes and Boyd why their testimony changed or was contrary to the testimony of several other witnesses.  Indeed, it was defense counsel who asked Boyd whether his testimony was influenced by threats or fear.  Moreover, it was not improper for the prosecutor to emphasize during closing argument that Boyd and Hayes both continue to live in the neighborhood and that other witnesses have moved out. While defendant correctly asserts that, in a criminal trial, a prosecutor may not inject issues broader than a defendant's guilt or innocence . . . during closing argument, a prosecutor has wide latitude and may argue the evidence and all reasonable inferences from it. . . . Further, the prosecutor is free to argue from the facts that a witness is not worthy of belief. . . . In context, it is clear that the prosecutor made permissible credibility arguments on the basis of facts elicited at trial.  Therefore, defendant has failed to show that a plain error occurred.  Moreover, were we to find error in the prosecutor's examination or closing remarks, defendant has failed to demonstrate that any error affected the outcome of the proceedings.

*See Stanton*, 2002 WL 31160297 at *1-2 (citations, quotations, and footnote omitted).

Having reviewed the record, this Court agrees and finds that the Michigan Court of

Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable

application of the law or the facts.  It is well-settled that it is improper for a prosecutor to

express his or her own personal beliefs and opinions concerning the credibility of a witness.  *See*

*United States v. Young*, 470 U.S. 1, 9-10 (1985); *United States v. Modena*, 302 F.3d 626, 634

(6th Cir. 2002).  Such statements are improper because they can convey the impression that the

prosecutor has evidence not presented to the jury which supports the charge against the

defendant thereby infringing upon the defendant's right to be judged solely based upon the

evidence presented and because the prosecutor's opinion carries with it the imprimatur of the

8

Government and may induce the jury to trust the Government's judgment rather than its own. *See United States v. White*, 58 Fed. Appx. 610, 617-18, 2003 WL 152314, *7 (6th Cir. 2003) (citing cases).

The record reveals that the prosecutor argued that certain witnesses were more or less worthy of belief based upon their trial testimony, their prior police statements, their current circumstances, and the other evidence presented at trial. The prosecutor's arguments were based upon reasonable inferences from that evidence. It is well-settled that a prosecutor has leeway to argue reasonable inferences from the evidence. *See, e.g., Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Additionally, a prosecutor may argue from the facts that a witness, including a testifying defendant, is not worthy of belief. *See, e.g, Portuondo v. Agard*, 529 U.S. 61, 69 (2000). While the prosecutor vigorously advocated the state's case and used strong language at times, the prosecutor did not impermissibly vouch for the witnesses' truthfulness (or untruthfulness), nor did the prosecutor express a personal belief in Petitioner's guilt.

Moreover, even if the prosecutor's comments could be seen as improper, they were not so flagrant as to render Petitioner's trial fundamentally unfair. While the comments were deliberate, they were not misleading, they were relatively isolated in nature when considered over the course of the entire trial, and the evidence of Petitioner's guilt was significant. Given these circumstances, it cannot be said that the disputed comments rendered Petitioner's trial fundamentally unfair.

Lastly, Petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S.

9

298, 326-27 (1995). "'[A]ctual innocence" means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. This claim is thus barred by procedural default, otherwise lacks merit, and do not warrant habeas relief.

### B.    Ineffective Assistance of Counsel Claims

Petitioner next contends that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the admission of other acts testimony and for failing to object to the alleged prosecutorial misconduct discussed *supra*. Respondent contends that these claims lack merit.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at

689.  The court must recognize that counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  *Id.* at 694.  A reasonable probability is one that is sufficient to

undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim

of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

the adversarial process that the [proceeding] cannot be relied on as having produced a just

result."  *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466

U.S. at 686).

Petitioner first asserts that trial counsel was deficient for failing to object to when the

prosecutor elicited testimony from Detroit Police Officer James Fleming that Petitioner's father

lied about Petitioner's name and whereabouts because such testimony was prohibited under

state law as "other acts" evidence.  The Michigan Court of Appeals determined that Petitioner

failed to establish that counsel was ineffective, stating:

> Defendant incorrectly contends that the evidence was inadmissible under MRE
> 404(b) and because it involved the bad acts of a third party.
>
> The disputed testimony arose when Officer Stanton testified about his process of
> tracking down defendant, after witnesses identified defendant as the person who
> shot and killed Adams.  Officer Stanton explained that he went to defendant's last
> known address and spoke to a man later identified as defendant's father.
> According to Officer Stanton, defendant's father said that defendant did not live
> at that address or did not visit that address very often.  Officer Stanton further
> testified that, when he asked for defendant's full name, his father gave him a false
> name.  Officer Stanton obtained a warrant for defendant's arrest and defendant's

11

father later accompanied defendant when he turned himself into the police.

Defendant correctly observes that MRE 404(b)(1) applies to the admissibility of evidence of other acts of any person, such as a defendant, a victim, or a witness. However, defendant's father was not a witness in the case and there is no indication that the prosecutor elicited this testimony from Officer Stanton as prohibited character evidence. Accordingly, we find no error to which defense counsel should have objected and defendant's claim is without merit.

*Stanton*, 2002 WL 31160297 at *2 (citations and quotations omitted).

This decision is neither contrary to *Strickland* nor an unreasonable application thereof. Because the officer's testimony was relevant and properly admitted under state law, Petitioner cannot show that counsel was deficient or that he was prejudiced by counsel's conduct. Counsel cannot be deemed deficient for failing to make a futile or meritless objection. *See McQueen*, 99 F.3d at 1328. Petitioner is thus not entitled to relief on this claim.

Petitioner also claims that counsel was ineffective for failing to object to the alleged prosecutorial misconduct set forth in his first habeas claim. Given that the Michigan Court of Appeals and this Court have found that the prosecutorial misconduct claim lacks merit, however, Petitioner cannot establish that trial counsel was deficient or that he was prejudiced by counsel's conduct. Accordingly, habeas relief is not warranted on this basis.

### C.   Jury Instruction Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court gave an improper reasonable doubt instruction. Respondent contends that this claim is barred by procedural default because Petitioner did not object to the jury instructions at trial.

As noted, habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright*, 433 U.S. at 85;

12

*see also Ylst*, 501 U.S. at 803-05; *Harris*, 489 U.S. at 263-64.  Here, the Michigan Court of Appeals rendered the last reasoned opinion discussing the jury instructions and relied upon the failure to object to the reasonable doubt instruction at trial in dismissing this claim.  *See Stanton*, 2002 WL 31160297 at *2.  The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors.  *See Coleman*, 501 U.S. at 750-51 (1991).  Moreover, the state court sufficiently relied upon the default despite ruling on the merits in the alternative.  *See McBee*, 929 F.2d at 267.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 753.  Petitioner does not allege cause to excuse this particular default.  Furthermore, he cannot establish prejudice as his jury instruction claim lacks merit.

In order for habeas relief to be granted based upon an improper jury instruction, a petitioner must show that the challenged instruction was so infirm that it rendered the trial fundamentally unfair.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is a heavy one.  The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether "the instruction is undesirable, erroneous, or even universally condemned."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)); *Austin v. Bell*, 126 F.3d

13

843, 846 (6th Cir. 1997). If an instruction is ambiguous and not necessarily erroneous, it violates

the Constitution only if there is a reasonable likelihood that the jury has applied the instruction

improperly. *Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999). A jury instruction is not to be

judged in artificial isolation, but must be considered in the context of the instructions as a whole

and the trial court record. *Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996).

Petitioner asserts that the trial court erred in instructing the jury on reasonable doubt by

failing to include "moral certainty" and "hesitate to act" language. The trial court instructed the

jury on reasonable doubt as follows:

> A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of
> evidence. It is not merely an imaginary or possible doubt, but a doubt based
> upon reason and common sense. A reasonable doubt is just that a doubt that is
> reasonable after a careful and considered examination of the facts and
> circumstances of this case.

2/7/01 Trial Tr., p. 128.

The Michigan Court of Appeals found no plain error with respect to this claim. *See*

*Stanton*, 2002 WL 31160297 at *2. This Court agrees and finds that the Michigan Court of

Appeals' decision is consistent with United States Supreme Court precedent and constitutes a

reasonable application thereof. The proper inquiry for a court reviewing a reasonable doubt

instruction is not whether the jury instruction could have been applied unconstitutionally, but

whether there is a reasonable likelihood that the jury did apply the jury instruction in an

unconstitutional manner. *See Victor v. Nebraska*, 511 U.S. 1, 6 (1994).

The reasonable doubt instruction given by the trial judge properly indicated the

prosecution's burden of proof. The court's non-use of the terms "moral certainty" and "hesitate

to act" did not violate Petitioner's due process rights because the trial court equated reasonable

doubt with "a fair, honest doubt" and "a doubt based upon reason and common sense."  The trial court also instructed the jury that Petitioner was presumed innocent until proven guilty, that the prosecution bore the burden of proving that Petitioner was guilty beyond a reasonable doubt, and that Petitioner was not required to come forward with evidence.  Considering the jury instructions in their entirety, the Court finds that the trial court properly instructed the jury on the concept of reasonable doubt and there is no reasonable likelihood that the jury applied the reasonable doubt instruction in an unconstitutional manner.  Moreover, the United States Court of Appeals for the Sixth Circuit has held that a similar reasonable doubt jury instruction satisfies due process.  *See Binder*, 198 F.3d at 178-79; *see also Szenay v. Yukins*, No. 98-1138, 1999 WL 187482, *6-7 (6th Cir. 1999) (unpublished).  Petitioner has not established that the jury instructions rendered his trial fundamentally unfair.

Lastly, Petitioner has not established that a fundamental miscarriage of justice has occurred.  *See Schlup,* 513 U.S. at 324-27; *see also Bousley*, 523 U.S. at 624.  His jury instruction claim is thus barred by procedural default, otherwise lacks merit, and does not warrant habeas relief.

### D.     Cumulative Error Claim

Lastly, Petitioner asserts that he is entitled to habeas relief based upon the cumulative effect of the alleged errors at trial.  Respondent contends that this claim lacks merit.

Petitioner is not entitled to relief based upon the cumulative effect of the alleged errors at trial given this Court's determination that Petitioner's claims are procedurally defaulted and/or lack merit.  Further, the United States Court of Appeals for the Sixth Circuit has noted that the United States Supreme Court "has not held that distinct constitutional claims can be cumulated

to grant habeas relief." *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Habeas relief is therefore not warranted on this claim.

## IV.    Conclusion

For the reasons stated, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.  Accordingly;

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.


GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE


DATED: _____**NOV 0 9 2005**_____

16

**APPENDIX**

**STANTON v. WOLFENBARGER**
**CASE NO. 04-CV-71351-DT**

# STATEMENT OF FACTS

Defendant James Stanton was charged with first-degree murder, in violation of MCL § 750.316, and felony firearm, in violation of MCL § 750.227b.

On October 13, 2000, the case was reassigned from Judge Boykin, who recused himself, to Judge Carole Youngblood. (T, 3; 10/13/00).

Before trial, defense counsel put on the record that the People had offered defendant a plea and sentence agreement whereby he would receive 13-40 years for second-degree murder, plus two years for felony firearm. (T, 3-4; 2/6/01).

**Detroit Police Officer Donna Babij** testified that she was an evidence technician. On August 21, 2000, at about 11:30 p.m. she had responded to a request from the Homicide Section to go to a crime scene at 6349 Vinewood, Detroit, with her partner, Officer Frank Horan. (T, 92-93; 2/6/01). They were there for about an hour and a half. Officer Horan photographed the scene and assisted in collecting evidence; she took measurements for a sketch. At this time, the decedent had already been taken away. (T, 94; 2/6/01). At the scene, she did not find any spent casings, fired bullets, or weapons. (T, 103; 2/6/01).

**Medical Examiner Yung A. Chung** testified that decedent died from a bullet wound to the heart. There was no evidence of close-range firing (within 12 inches). (T, 113-114; 2/6/01). The wound track was front to back, slightly right to left, and a little bit downward. (T, 115-116; 2/6/01). There were also multiple abrasions on the right cheek, left wrist, the back of the right hand, the knuckles of both hands and the right hip area, and both knees; also there were other small abrasions and scratches. (T, 116; 2/6/01). A punch or a fall could have caused the abrasions. (T, 117; 2/6/01).

The decedent had been five feet, nine inches tall, and weighed 149 pounds. (T, 115; 2/6/01). At the time of death, decedent was not under the influence of alcohol or drugs. (T, 115; 2/6/01). The cause of death was a single gunshot wound to the chest; the manner of death was homicide. (T, 118; 2/6/01).

1

**Norman Adams** testified that he was the brother of decedent Anthony Adams, also known as Boo. (T, 121; 2/6/01). He identified defendant, indicating he knew him as Fish, and had known him for two or three years. (T, 123-124; 2/6/01). He knew Fish from just being around the neighborhood selling drugs. He saw Fish in that neighborhood every day he was over there. (T, 124; 2/6/01).

On Monday evening, August 21, 2000, Norman Adams stated he was next to 6349 Vinewood, which was a two-family flat. He was on the front porch. (T, 127; 2/6/01). Adams testified that at about 10:30 p.m.

> I was like in the street on my way to the street going to sell some drugs, illegal substance, and I heard some could [sic] motion. And then the defendant . . . and Anthony Adams were fighting and arguing. (T, 129; 2/6/01).

They were fighting with their hands, on the sidewalk in front of 6351 Vinewood. Norman Adams did not see a knife or gun on Anthony Adams, or any other kind of weapon. (T, 130; 2/6/01). At that time, Boo Adams was dressed in a couple of shirts and some shorts and jogging pants. (T, 131; 2/6/01).

Norman Adams did not know what started the argument or the fight; he just saw them fighting, for about a minute, and then defendant went away because Norman Adams and Kevin Watson attempted to break up or stop the fight. (T, 131-132; 2/6/01). Defendant pushed Kevin Watson away, and said "I'm fenna [sic] kill this nigga." This was uttered after the fight was broken up. (T, 132; 2/6/01).

Norman Adams was in the street when defendant went away. Boo Adams was on the sidewalk by the porch next door to 6349 Vinewood. Norman Adams said Jeffrey "Shanka" Boyd was on the porch, along with Anthony Hayes. (T, 132-133; 2/6/01).

Norman Adams saw defendant go down the street, but then testified that defendant did not come back with a gun. (T, 134; 2/6/01). Defendant walked up the side of the house, towards the back of the house. Defendant unwrapped a

2

gun from a white plastic bag. It looked like a chrome .38 revolver. Then defendant started walking towards the front of the house. Norman Adams heard him say to Anthony Adams, "I'm gonna kill you, motherfucker. You think I'm playing." (T, 135-136; 2/6/01).

At this time Anthony Adams was standing by the porch, without a weapon. He did not say anything in response to Mr. Stanton. (T, 136; 2/6/01). Norman Adams heard four to six shots, and saw his brother grab his chest and start running. Then Norman Adams ran down the street. He did not see where defendant went after firing the shots. (T, 137; 2/6/01). The next time he saw defendant was when he was walking back off the side of the house where he had gotten the gun from. (T, 138; 2/6/01).

At this time, Norman Adams thought his brother had been hit or shot, but did not know where he was. (T, 138; 2/6/01). The defendant walked towards Milford Street, saying "That's why I killed that M.F.er." (T, 139; 2/6/01).

Norman Adams' cousin Anthony Hayes found decedent about ten minutes later. (T, 139; 2/6/01). When Norman Adams saw decedent, he was lying face down on the grass, with a red blood spot in the back of his shirt. (T, 140; 2/6/01).

On cross-examination, Norman Adams stated that Anthony Adams, Anthony Hayes, Gregory Cole, Jeffrey Boyd, Cameron Watson, and defendant James Stanton were present. (T, 142-143; 2/6/01).

After Mr. Stanton and decedent were fighting, and then separated, Norman Adams walked off. He did not hear his brother Boo Adams say anything to Mr. Stanton. (T, 143-144; 2/6/01).

Norman Adams testified that he was in the area because "I was selling illegal substance"; when pressed, he admitted he was selling cocaine. (T, 146; 2/6/01). Even though he was busy selling cocaine, he said he helped to break up the fight, along with Kevin Watson. (T, 146-147; 2/6/01). He stated that defendant did not have a conversation with anyone else before he walked down the street. (T, 147; 2/6/01).

Norman Adams said he heard Mr. Stanton tell decedent Boo Adams "that he had no stripes over there in that neighborhood." (T, 148; 2/6/01).

Adams stated that he thought after the fight, his brother Boo put a gray shirt back on. (T, 153-154; 2/6/01).

**Tammy Cole** testified that she knew defendant as "Fish." (T, 159; 2/6/01). She was upstairs and heard one gunshot, and heard her girls on the porch screaming. She ran downstairs. (T, 160-161; 2/6/01). She did not see who shot the gun. (T, 161; 2/6/01). She saw defendant coming down the street saying "That's what that motherfucker get for chokin' me." He was by himself at that time. He walked right by her; she did not remember if he had a gun. (T, 161; 2/6/01). She did not think he even saw her as he went by. (T, 162; 2/6/01).

She went to where decedent's body was. She did not see a gun, knife, or other weapon there. (T, 163-164; 2/6/01).

The prosecutor asked the witness if she had seen her nephew, Anthony Hayes, since the previous week. She answered:

> No. He left home on a Wednesday, if I'm not mistaken. I was called at home by my mother and she told me that Anthony--

At this point a defense objection was sustained. (T, 164; 2/6/01). Then the prosecutor engaged in the following colloquy with the witness:

> Q. So the day after you were down here last week Anthony disappeared; is that correct?
> A. Right.
> Q. You haven't seen him since?
> A. No.
> Q. Or heard from him since?
> A. No.
> Q. Did you report that to the Prosecutor's Office and to the police?
> A. I didn't. No, I didn't. (T, 164-165; 2/6/01).

**Gregory Taylor** testified that he was 17 years old, and lived at 6321 Vinewood in August of 2000, with his mother Tammy Cole, and other family members. By the time of trial, he had moved. (T, 5; 2/7/01). He knew 17-year-old Jeffrey "Shanka" Boyd from the neighborhood. (T, 6; 2/7/01). His cousin,

4

Anthony Hayes, also had lived on Vinewood with his mother.  Anthony had moved, but his mother still lived there.  (T, 7-8; 2/7/01).

He knew defendant as Fish or James.  (T, 8-9; 2/7/01).  He saw Fish in the neighborhood almost every day with his friends or buddies in the neighborhood: Shamari Woodard, Keba Woodard, and Kevin Watson.  (T, 9-10; 2/7/01).

In the incident, Gregory Taylor left the porch and when he came back defendant and decedent were arguing.  (T, 12-13; 2/7/01).  The argument turned into wrestling; James had Boo on the ground.  After they got up, they exchanged more words, making threats towards each other.  (T, 13-14; 2/7/01).

He did not see any kind of a knife, gun, or other weapon.  (T, 14; 2/7/01).

According to Taylor, after the fight stopped, defendant left, and walked up the block, south towards Milford.  (T, 15; 2/7/01).  As Taylor was going towards his own house, he heard shooting and ran into the house.  (T, 17; 2/7/01).  He heard three or four shots.  (T, 18; 2/7/01).  He did not look back to see who was shooting.  He never saw anyone with a gun.  (T, 19; 2/7/01).

He left the house when he heard Desiree Williams screaming outside.  He ran into the backyard of 6345 Vinewood where Boo was lying dead.  At the time of the shots, he did not know that someone had been injured.  (T, 20; 2/7/01).

After this incident, Taylor did not see James in the neighborhood any more.  (T, 21-22; 2/7/01).

Taylor did not recall any specific words passed back and forth between defendant and decedent, but did know there were threats sent back and forth.  "Both of them were threatening each other."  (T, 24; 2/7/01).  He stated he could not remember because he tried to get stuff like that out of his head, and not think about it.  (T, 25; 2/7/01).

Taylor was in the twelfth grade at Northwestern High School.  (T, 26; 2/7/01).

**Desiree Williams** testified that in August 2000 she was living on Eastern near Vinewood, with her brother Norman Adams and other family members. She no longer lived there. (T, 28-29; 2/7/01).

Decedent Anthony "Boo" Adams had been her older brother. She knew Jeffrey "Shanka" Boyd from the neighborhood. (T, 29; 2/7/01). She identified Anthony Hayes as her 16-year-old cousin, who still lived on Vinewood with his mother. (T, 30; 2/7/01).

The prosecutor elicited that Anthony Hayes was in court the previous week, but the trial got adjourned to the day before (February 6, 2001), and Anthony Hayes was not there in court. (T, 31; 2/7/01).

The prosecutor then elicited that Ms. Williams had had "some conversation or telephone calls to me in between last week and yesterday to talk about Anthony Hayes." (T, 31; 2/7/01).

The prosecutor also elicited that she knew Tammy Cole and her son Jeffrey Taylor, who lived on Vinewood at the time of the incident. (T, 31-32; 2/7/01).

She was not present when Anthony "Boo" Adams got shot. (T, 32; 2/7/01). She identified defendant as "Fish" or "James." He did not live in the neighborhood. (T, 32; 2/7/01). He was around the neighborhood virtually every day in July and August, but she did not see him around after the incident. (T, 33; 2/7/01). She found out about the incident when her younger brother Norman Adams ran in the house on Eastern and told her that Fish shot her brother. They both ran to Vinewood. Before she arrived, her cousin Anthony Hayes "told me where he was at and that he was dead." (T, 33-34; 2/7/01). She found decedent behind 6439 Vinewood. (T, 34; 2/7/01). She saw no weapon on him or near him. (T, 35; 2/7/01).

The prosecutor further elicited that her brother Boo knew James Stanton for about five or six years. (T, 35-36; 2/7/01).

6

She identified a woman named Theresa, known as Tree, who had a relationship first with defendant James Stanton, in 1997-1998, then broke up with him and went with her brother, decedent Boo Adams. (T, 36; 2/7/01). They were together for about three years, but had broken up in approximately October of 1999. (T, 37; 2/7/01).

She stated that she and her cousin Tammy Cole were the first people in the back where Boo Adams lay. (T, 37-38; 2/7/01).

**Jeffrey "Shanka" Boyd** testified that he was in the twelfth grade. (T, 39; 2/7/01). He lived at 6345 Vinewood in the upper flat. (T, 40; 2/7/01). His grandmother, grandfather, and sister lived in the lower flat. His grandfather and his mother had brought him down to court. (T, 40; 2/7/01).

He did not know Boo Adams, and had only seen him "one time when he was in my backyard dead." (T, 41; 2/7/01). He did not know witnesses Norman Adams, Anthony Hayes, and Kevin Watson. (T, 41-42, 44; 2/7/01). He did know witness Gregory Taylor, who used to live on Vinewood. (T, 42; 2/7/01). He and Taylor were good friends. (T, 42-43; 2/7/01).

He did not know anyone in the neighborhood named Fish or James, and had not seen him there before. He stated, "I don't hang in the neighborhood. I work." (T, 43; 2/7/01).

He testified that he was not on the porch, but was in the house when the shooting occurred. He did not see an argument or fight between Fish and Boo. (T, 45; 2/7/01). He did not have any idea why other witnesses would say he was outside. He did not hear any gunshots. He found out about the shooting when a girl knocked on his door and told him somebody was dead in his back yard. (T, 46; 2/7/01). He had been in the house on the telephone. He stated, "I was in the house all the time. I don't hang in the neighborhood." He stated he still lived there. (T, 47; 2/7/01). Defense counsel asked if the witness had been told what to say, or threatened, and he said no. (T, 48; 2/7/01).

7

**Police Officer Richard Firsdon** and his partner, Eric Johnson, responded to a report of "shots fired, one down" and arrived at the rear of 6349 Vinewood at about 11:10 p.m. (T, 50-51; 2/7/01). They arrived within three minutes of the radio run, and were the first police on the scene. He saw a black male lying on the parking lot behind the house, half on the concrete, half on the grass. (T, 51-52; 2/7/01). He saw an unknown amount of apparent bullet wounds in the rear of the torso. He obtained the name of Anthony Adams. No weapon was observed. He preserved the scene until Homicide and evidence technicians responded. (T, 53; 2/7/01).

Officer Firsdon was informed of a possible perpetrator by a first name, James, and a street name, Fish, as well as a description. (T, 53-54; 2/7/01).

**Police Officer Mark Salazar** testified that he and his partner, Officer Kevin Brathwaite, went to Henry Ford Hospital at about 11:55 on Monday, August 21, 2000. They obtained a chart number for Anthony Adams, and found that his condition was "dead on arrival." (T, 56-57; 2/7/01). They obtained his clothes and a blanket, and put them on evidence. They obtained no bullets or weapons from the hospital. (T, 58; 2/7/01).

**Police Sgt. James Fleming** testified that he was with the Detroit Police Homicide Section. (T, 59; 2/7/01). He did a computer search, and developed information leading to the identification of defendant James Stanton. (T, 61-62; 2/7/01).

Sgt. Fleming testified that he went to an address on Chapel Street, and encountered James Stanton's father. The father told him that James did not live there and did not come by very often. The father also gave him "an erroneous name like James Edwards . . . or Edward James." (T, 62-63; 2/7/01). Thereafter, he procured a warrant on August 28, 2000; defendant Stanton turned himself in on September 1, 2000, when he came in with his father. He was looking for defendant all the time between August 21 to September 1, 2000. (T, 63; 2/7/01).

8

Sgt. Fleming testified that witness Anthony Hayes had testified at the preliminary examination. (T, 63; 2/7/01). Although Hayes was at court the previous week, when trial got adjourned, he did not return on Tuesday, February 6, 2001. (T, 64; 2/7/01). Approximately three or four days before February 6th, Sgt. Fleming was notified that Anthony Hayes had run away from home and had not been at school, and a missing-persons report had been filed. (T, 64; 2/7/01). Sgt. Fleming then obtained a material-witness detainer for Anthony Hayes, but still was not able to find him, after searching other addresses. (T, 64-65; 2/7/01).

Out of the jury's presence, the prosecutor stated that he had shown due diligence in seeking to produce the witness. The Court noted, "In fact, I ordered him to come back." The prosecutor responded:

> You did. And the next thing I know is on Thursday, I got a phone call saying that he had left the house, taken his clothes and two garbage bags, said he was tired of the threats and he wasn't gonna come down and testify. . . . There has been some rumor that maybe he's present here in the building today, but I have not seen his person as yet. (T, 65-66; 2/7/01).

The prosecutor sought permission to read his preliminary examination testimony into evidence. Thereafter, Anthony Hayes appeared in the courtroom. (T, 66-67; 2/7/01).

**Anthony Hayes** testified that he was 16 years old, and lived at 6427 Vinewood. (T, 69; 2/7/01). He knew defendant as someone who would be over in that neighborhood. (T, 70-71; 2/7/01). He testified that he came down to court when the case was set for trial the previous Tuesday. (T, 73; 2/7/01). He stated he was told to come back "yesterday" (Tuesday, February 6, 2001). He stated that he went home last week after the case was adjourned, but the last night he spent at home was Wednesday. From Thursday through Tuesday, February 6, 2001, he stayed at the house of a friend named Cantrell. He did not tell his mother where he was going, and took his clothes with him. He said he was dropped off at court on February 7th by Cantrell's mother. (T, 74-76; 2/7/01).

9

The prosecutor elicited that Anthony Hayes was brought up to court by a lawyer in the audience. (T, 76; 2/7/01). The man Hayes was sitting next to in court was his friend "Peanut," whose real name was Dejuan. The prosecutor also elicited that Dejuan had a brother named Delmar, and that they were friends of defendant. (T, 77; 2/7/01).

He testified that defendant and decedent got into an argument over who was the toughest on the block, then started wrestling. (T, 78-79; 2/7/01). Norman Adams tried unsuccessfully to break it up. (T, 79-80; 2/7/01).

As defendant and decedent wrestled on the sidewalk, and were "cussin' each other out," the witness walked off the porch and heard some shots. He did not know who fired. He heard about three shots, then ran and hid. (T, 81-82; 2/7/01). He did not see who fired the shots, or who had a gun. He never saw a weapon in the hand of his cousin Boo (decedent). (T 82; 2/7/01). After he heard the shots, he walked off and went home. He never saw Fish after the shots, or heard him say anything. (T, 82-83; 2/7/01).

He did not know where Boo Adams ended up, and he did not ever go tell Desiree [Williams] where Boo was. (T, 83; 2/7/01).

He admitted knowing Sgt. Fleming, the Homicide Officer in charge of the case. (T, 83; 2/7/01). He made and signed a statement in front of Sgt. Fleming. (T, 84-85; 2/7/01).

The prosecutor asked if the witness had told Sgt. Fleming about anything that Fish said; he stated, "I told him, but it was a lie." (T, 86; 2/7/01). The prosecutor responded:

> Q. You told him it was a lie. Well let's see if this is what you told him. "Then me, Fish and a guy name Kevin was walkin' to the store and Fish was saying that he hoped that Anthony Adams was going to say something so he could quote, 'fuck him up'." Did you tell him that?

The witness said "Yeah," but reiterated that this was a lie. (T, 86-87; 2/7/01).

The prosecutor asked if the witness had told Sgt. Fleming that he saw Fish with a gun after the shooting. When the witness denied this, the prosecutor asked:

> Did you say to him, "Then Fish went to the side of the house and got a gun. I heard a gunshot and I turned around and I saw Fish with a gun and I saw my cousin Anthony Adams holding his chest."

The witness admitted stating this to Sgt. Fleming. (T, 89; 2/7/01). He also admitted telling Sgt. Fleming, "I saw Fish still chasing my cousin firing shots at him." (T, 90; 2/7/01). However, he never saw that because he was hiding on the side of the house. (T, 91; 2/7/01).

The witness also admitted telling Sgt. Fleming, "Fish walked right past us after the shooting and Fish said that's what he get, I shot his punk ass," but that was not true. (T, 91; 2/7/01).

Hayes denied testifying at the preliminary examination that he saw Fish shoot with a gun that day. (T, 92-93; 2/7/01).

Hayes testified that after the wrestling had stopped between Boo and Fish, Boo said to Fish "I'm gonna kill ya' and you can bet your mama on that." (T, 93-94; 2/7/01). Hayes admitted telling Sgt. Fleming "Fish said hold on a minute, I'm gonna go get my gun." (T, 94; 2/7/01). Hayes admitted telling Sgt. Fleming that he saw one gun, the one that Fish had, but stated that was untrue. (T, 95; 2/7/01).

The following exchange then took place:

> Q. Why weren't you here yesterday, sir?
> A. I was here yesterday.
> Q. You were?
> A. Yes.
> Q. You weren't on this floor yesterday.
> A. I know.
> Q. What floor were you on?
> A. The sixth floor.
> Q. . . . Why were you on the sixth floor and not the seventh floor?
> A. That's where, just where I was at.
> Q. Who were you there with?
> A. Few people. . .
> Q. Who were the few people that were there with [you]? . . .
> (T, 95-96; 2/7/01).

11

Hayes indicated he was with defendant's family members and friends. (T, 96; 2/7/01).

The prosecutor later asked Anthony Hayes:

Q. So anybody pay you any money to change your testimony, young man?
A. No.
Q. No. You been promised anything?
A. No.
Q. You sure?
A. Yes. (T, 101; 2/7/01).

Then the prosecutor asked if the witness knew a man who just walked out of the courtroom, asking, "Fish's dad? Do you know Fish's dad?" Hayes said he did not know that was his dad, and had not seen him before. (T, 101-102; 2/7/01).

The prosecution introduced Anthony Hayes' preliminary examination testimony that Fish had stated decedent was threatening him, and he was going to get his gun. Then Fish went to the side of the house, and came back with the gun and came back shooting. (T, 106-107; 2/7/01). After the first shot, Hayes saw decedent holding his chest, and defendant had a small gun pointed at decedent. (T, 107; 2/7/01). Then Fish was running after decedent, shooting four shots. (T, 108; 2/7/01).

The prosecution rested; the defense presented no witnesses, and rested. (T, 108; 2/7/01). The prosecutor argued

you've seen witnesses come in, witnesses come in from the neighborhood. A lot of the witnesses like Shanka who still lives out there, who goes to school, whose parents or his mom still lives there, his grandfather and grandmother still live there, Shanka or Gregory [sic] Jeffrey Boyd, he is a see no evil, hear no evil, speak no evil person. I submit to you, ladies and gentlemen, he was out there. He saw it but he is not gonna get involved in this particular incident. Even though he was there, even though he knows these parties, he still lives there, he still has to deal with them. He is not gonna get involved.

Mr. Cole, Mr. Taylor and his mother Mrs. Cole, they have been able to move from the neighborhood. So, too, have Desiree and her brother Norman. They have been able to move from the neighborhood, so they're not there and they're not at risk. They came in and they testified.

I submit to you that Mrs. Cole and her son Gregory Taylor who testified, Mrs. Cole yesterday and Gregory Taylor this morning,

were what I would call quality witnesses who gave good testimony, testimony I think that you can rely on and testimony that you can believe. Mrs. Cole testifying about what she heard the defendant say as he left. Gregory Taylor telling you how what went down out there. (T, 116-117; 2/7/01).

The prosecutor further argued:

Norman Adams is close to his brother. Finally, Anthony Hayes who still has to live in the neighborhood. Whose mother still lives there and who still lives there. What happens? Anthony Hayes goes underground, surfaces either [sic] yesterday down on the sixth floor with the defendant's sister and then this morning also gets brought down by some other friends.

I submit to you that you can see the pressure, the fear in what goes on when you have a killing or something like this happen in the neighborhood and you have to remain there. Sometimes it's not pretty, sometimes it's even kind [of] ugly. (T, 117-118; 2/7/01).

The judge gave a standard reasonable-doubt instruction:

A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case. (T, 128; 2/7/01).

The jury found defendant guilty of second-degree murder, and felony firearm. (T, 4; 2/8/01).

Defendant was sentenced to 18-30 years in prison for second-degree murder, in violation of MCL § 750.317, consecutive to two years for felony firearm, in violation of MCL § 750.227b. He received jail credit of 177 days. (T, 12-13; 2/27/01).

Further facts are set forth in relevant portions of the following Argument.